THE HONORABLE ROSANNA MALOUF PETERSON

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

| | |
|---|---|
| CITY OF ROYAL OAK RETIREMENT SYSTEM, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>                           Plaintiffs,<br><br>      vs.<br><br>ITRON, INC., et al.,<br><br>                           Defendants. | No. 2:11-cv-00077-RMP<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><br>DEMAND FOR JURY TRIAL |

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

**INTRODUCTION**

1.      This is a securities fraud class action on behalf of all persons who purchased or otherwise acquired Itron, Inc. ("Itron" or the "Company") securities between April 28, 2010 and February 16, 2011, inclusive (the "Class Period"), against Itron and certain of Itron's officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Itron provides a portfolio of products and services to electrical, natural gas and water utilities worldwide.  The Company offers meters as well as data collection, analysis and communication systems that assist utilities in measuring and managing power consumption.  The Company's products include Advanced Metering Infrastructures ("AMI") and Automated Meter Reading ("AMR") systems and a range of utility software and services.[1]

3.      On February 16, 2011, Itron admitted that it had materially misstated its financial statements during the Class Period, including the overstatement of revenue, net income and earnings per share ("EPS").  On that day, the Company restated its financial statements for the three quarters ending September 30, 2010 to correct a $6.1 million overstatement of revenue, which resulted in a nearly 6.0% overstatement of Itron's bottom-line – $4.6 million in net income and $0.11 in EPS.  Itron admitted that it had overstated revenue, net income and EPS during the Class Period because it had

---

[1]      Automatic Meter Reading, or "AMR," enables a utility to collect meter data electronically without requiring an individual to physically visit and read a meter.  Advanced Metering Infrastructure, or "AMI," provides utilities with the increased capability to collect and analyze detailed data concerning energy consumption for more efficient grid management.  Unlike AMR, AMI contains communications and data management hardware and software that permit two-way communication between the advanced meter and the utility, enabling both collection and distribution (to consumers and others) of energy use and price information.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 1 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

improperly accounted for an extended warranty provision related to one of the Company's large OpenWay[2] contracts.[3] Itron's restatement amounts to an admission that the Company's financial statements during the Class Period contained **material** errors made by improperly applying governing accounting principles.

4.     During the Class Period, each of the individual defendants, in their capacities as either Chief Executive Officer ("CEO") or Chief Financial Officer ("CFO") of Itron, signed certifications required by §906 of the Sarbanes-Oxley Act of 2002 ("SOX") and 18 U.S.C. §1350.  These certifications assured investors of the accuracy of Itron's financial statements and the effectiveness of the Company's disclosure controls and internal controls over financial reporting.  The February 16, 2011 restatement of Itron's financial statements was an admission that these certifications were false.

5.     Itron's improper accounting related to one of the Company's largest customers.  The Company's 10 largest customers accounted for 34% of revenue in 2010, with the largest customer representing 11% of revenue.  Significantly, defendants emphasized the importance of these large contracts, stating, "[a]s we enter into agreements related to the deployment of smart metering systems and technology, the value of these contracts is substantially larger than contracts we have had with our customers in the past."[4]  Clearly, these very large contracts would have been scrutinized by management given their material impact on Itron's financial results.

---

[2]     OpenWay is Itron's AMI solution.

[3]     On February 17, 2011, Wedbush published a report covering Itron stating that management had advised investors that the restatement was the result of improper accounting on "one large AMI contract."

[4]     Itron's Annual Report on Security and Exchange Commission ("SEC") Form 10-K for the year ended December 31, 2010, filed on February 24, 2011 ("FY10 Form 10-K").

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)      - 2 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

6.     Prior to the Class Period, Itron had won four major OpenWay, or AMI, contracts with Southern California Edison, Center Point Energy, DTE Energy and San Diego Gas & Electric.  By the start of the Class Period, however, it had been more than one year since Itron had landed a large AMI deal.  As a result, the Company's large, existing AMI contracts took center stage and management repeatedly touted and discussed these contracts with analysts and investors in its public filings and on conference calls.  For example, when defendants participated in Barclays Capital High Yield Bond and Syndicated Loan Conference on March 26, 2010, defendants highlighted the Company's focus on these major AMI contracts for investors:

> We had signed four very, very large contracts, which we are doing 14 million meters and modules under contract, about 1.4 billion in total and we are actively installing.  Now on these contracts as of December 31, we had shipped about a million OpenWay units as of that point across these projects and there has been a lot of focus and visibility in particular on that, particularly Southern California Edison who will be automating 5.3 million meters. . . .  Center Point Energy is Houston. They will be automating 3 million in total. . . .  DTE Energy is in Detroit and then San Diego Gas & Electric is another one of our major projects we are focusing on as well.[5]

Similarly, during the Company's 1Q10 Earnings Conference Call on April 28, 2010,[6] CEO Malcolm Unsworth's ("Unsworth") opening remarks also highlighted OpenWay contracts as pivotal to Itron's business – "With regards to our OpenWay contracts, installations continue to successfully ramp.  Our execution and deployment on these contracts is going well, ***and continues to be a top priority***."  *Id.* at 4.[7]

---

[5]     Conference call transcript of Itron, Inc. at Barclays Capital High Yield Bond and Syndicated Loan Conference, dated March 26, 2010.

[6]     Itron's Q1 2010 Earnings Call Transcript, dated April 28, 2010 ("Company's 1Q10 Earnings Conference Call").

[7]     Here, as elsewhere, emphasis has been added and citations omitted unless otherwise noted.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 3 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

7.     Given the importance of the Company's OpenWay contracts, defendants were intimately aware of and provided investors with substantial detail concerning their financial impact.  During the Company's 1Q10 Earnings Conference Call, Unsworth advised investors that Center Point Energy's accelerated deployment and $200 million in stimulus funding had been "baked . . . into [Itron's] 12-month backlog," DTE Energy was "not in [Itron's] backlog," and that DTE would be firm enough to put in the backlog during "[t]his quarter," meaning 2Q10.  *Id.* at 8, 18.  In his opening remarks, CFO Steven M. Helmbrecht ("Helmbrecht") also elaborated on financial metrics regarding the AMI contracts.  He explained that bookings for the quarter "included $260 million related to our OpenWay contract with San Diego Gas and Electric."  *Id.* at 4.

8.     During the Company's 2Q10 Earnings Conference Call on July 28, 2010,[8] Unsworth again highlighted Itron's OpenWay contracts, stating:

> First, a couple of comments on our OpenWay contracts.  We recently surpassed the three millionth endpoint shipment milestone of OpenWay units.  Installations continue to ramp.  Our execution and deployment on these contracts is going well and ***continues to be a top priority***. Southern California Edison recently celebrated the installation of their one millionth SmartConnect meter.  As you know our OpenWay solution is the foundation.

*Id.*  Additionally, Helmbrecht explained that Itron's quarterly bookings included $339 million from DTE Energy.

9.     Management's repeated scrutiny of and familiarity with its large AMI contracts would have revealed any accounting impropriety associated with these contracts.  Significantly, the simplicity of accounting for extended warranty provisions further emphasizes the improbability that the restatement resulted from an accounting

---

[8]     Itron's 2Q 2010 Earnings Conference Call Transcript, dated July 28, 2010 ("Company's 2Q10 Earnings Conference Call").

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)                - 4 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

"mistake." Accounting for an extended warranty provision is not complex. It does not require subjective judgment or the interpretation of complicated, vague or arcane accounting rules. As simply put in the Company's FY10 Form 10-K:

> Certain of our revenue arrangements include an extended or noncustomary warranty provision which covers all or a portion of a customer's replacement or repair costs beyond the standard or customary warranty period. Whether or not the extended warranty is separately priced in the arrangement, a portion of the arrangement's total consideration is allocated to this extended warranty deliverable. This revenue is deferred and recognized over the extended warranty coverage period.

*Id.* at 41. Defendants understood how to account for the warranty provision because of the clear, concise guidelines they articulated to the public.

10.    The magnitude of the restatement in relation to the item in question would also have alerted defendants to the accounting impropriety. Itron has publicly stated that "Extended/noncustomary warranties do not represent a significant portion of our revenue." *Id.* at 26. In contrast to Itron's public representation that extended warranty revenue does not "significantly" contribute to the Company's financial results, this single warranty provision related to a single AMI contract led to an overstatement of Itron's net income and EPS of nearly 6% for the first three quarters of 2010.

11.    When Itron announced the restatement on February 16, 2011, its stock collapsed $6.33 per share to close at $57.29 per share on February 17, 2011, a one-day decline of 10% on unusually high volume. The Company's shares were ultimately hammered by massive sales, sending them down over 29% from their Class Period high.

12.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to properly account for its extended warranty obligations in violation of Generally Accepted Accounting Principles ("GAAP"); and

645069_2
CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)
- 5 -
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

(b)    The Company had failed to maintain effective internal controls.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.  Itron maintains its principal executive office at 2111 North Molter Road, Liberty Lake, Washington 99019.

16.    In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

17.    By Court Order dated June 23, 2011, City of Royal Oak Retirement System ("Royal Oak") was appointed Lead Plaintiff in this action.  As set forth in the certification of Royal Oak, filed in connection with its motion to be appointed Lead Plaintiff, Royal Oak purchased Itron securities during the Class Period and, as a result of defendants' conduct alleged herein, suffered damages in connection with the purchase of Itron securities.  *See* ECF No. 11 at Ex. B.

18.    Defendant Itron provides a portfolio of products and services to electricity, natural gas and water utilities worldwide.  The Company offers meters as well as data collection and communication systems, including AMI and AMR systems

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)                - 6 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

and a range of utility software and services.  During the Class Period, Itron operated in two segments: Itron North America and Itron International.  Itron North America had approximately 3,000 customers and more than 8,500 employees, while Itron International had approximately 5,000 customers and 6,000 employees.   The Company's maintained its largest AMI contracts with Southern California Edison, Center Point Energy, DTE Energy and San Diego Gas & Electric.

19.    Defendant Malcolm Unsworth is, and at all relevant times has been, the Company's President, CEO and a member of the Company's Board of Directors.

20.    Defendant Steven M. Helmbrecht is, and at all relevant times has been, the Company's CFO and Senior Vice President.

21.    The defendants referenced above in ¶¶19-20 above are referred to herein as the "Individual Defendants."

22.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Itron's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  Each of the Individual Defendants also signed SOX certifications accompanying the Form 10-Qs filed with the SEC during the Class Period.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)      - 7 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

23.     As officers and controlling persons of a publicly-held company whose common stock was traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") during the Class Period, and governed by the federal securities laws, each of the Individual Defendants had a duty to disseminate promptly accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Itron's publicly-traded common stock would be based upon truthful and accurate information.    The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations and are liable for the false statements pleaded herein.

24.     Each of the defendants is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit upon purchasers or acquirers of Itron securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Itron's business; (ii) artificially inflated the price of Itron's common stock; and (iii) caused plaintiff and other members of the class to purchase Itron securities at inflated prices.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Itron securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives,

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)         - 8 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1  heirs, successors or assigns and any entity in which defendants have or had a

2  controlling interest.

3      26.    The members of the Class are so numerous that joinder of all members is

4  impracticable.  The disposition of their claims in a class action will provide substantial

5  benefits to the parties and the Court.  Itron has over 40 million shares of stock

6  outstanding, owned by hundreds if not thousands of persons.

7      27.    There is a well-defined community of interest in the questions of law and

8  fact involved in this case.  Questions of law and fact common to the members of the

9  Class which predominate over questions which may affect individual Class members

10  include:

11          (a)    whether the Exchange Act was violated by defendants;

12          (b)    whether defendants omitted and/or misrepresented material facts;

13          (c)    whether defendants' statements omitted material facts necessary to

14  make the statements made, in light of the circumstances under which they were made,

15  not misleading;

16          (d)    whether defendants knew or deliberately disregarded that their

17  statements were false and misleading;

18          (e)    whether the price of Itron securities was artificially inflated; and

19          (f)    the extent of damage sustained by Class members and the

20  appropriate measure of damages.

21      28.    Plaintiff's claims are typical of those of the Class because plaintiff and

22  the Class sustained damages from defendants' wrongful conduct.

23      29.    Plaintiff will adequately protect the interests of the Class and has retained

24  counsel who are experienced in class action securities litigation.  Plaintiff has no

25  interests which conflict with those of the Class.

26

645069_2
CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 9 -
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

30.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

31.    Leading up to the Class Period, Itron was aggressively competing for AMI contracts with utilities that had just been awarded massive stimulus grants to build out the smart grid.  The Company had previously won major contracts with Southern California Edison, Center Point Energy, DTE Energy and San Diego Gas & Electric.    But by the start of the Class Period, as competitors with advanced technological solutions began to compete in the smart grid solution space, Itron had not won a major AMI contract for more than a year.

32.    Analysts and investors were acutely aware of Itron's reliance on these four major AMI contracts and the Company's failure to win any major new contracts leading into the Class Period.  The market stressed the importance of Itron's winning new AMI contracts going forward and expressed concern that the Company's failure to gain any new business would lead to backlog depletion and thus decreased revenue and earnings going forward.  With respect to the smart grid funding being dolled out in 2010, defendants themselves, during a quarterly earnings conference call with investors, confirmed that "[o]ur goal obviously is to win as much of this [AMI] business as we can."  Company's 1Q10 Earnings Conference Call at 5.

33.    Despite defendants' aggressive bidding, Itron failed to win any large AMI contracts in 1Q10, enhancing investors' concerns.  For example, during the Company's 1Q10 Earnings Conference Call, analyst Steve Sanders of Stephens, Inc. asked, "absent a significant win during the current quarter should we think about the 12-month backlog starting to flatten out or decline?" *Id.* at 9.  Management refused to comment other than to say that the Company could still win a deal going forward.

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)    - 10 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

34. Likewise, in 2Q10, both defendants and analysts noted their disappointment in the Company's loss of recent contract awards. Unsworth explained that Itron "had some competitive disappointments in North America [and] [a]ll of us at Itron are very upset about it." Company's 2Q10 Earnings Conference Call at 4. Towards the end of 2Q10, Macquarie Group issued a report on the US smart grid, expressing caution on Itron's "longer-term outlook" given a "plateau" in its earnings forecasts for the Company.

35. By 3Q10, Itron had not booked a major AMI contract in more than two years and analysts were demonstrating further concern that revenue and earnings would either plateau or recede going forward. Analyst Craig Irwin of Wedbush noted in a report dated October 28, 2010, "the strong potential for a significant backlog decline during 2011 as Itron implements units of its four major AMI projects," and feared that "this would signal a high probability of declining earnings."

36. Against this backdrop of investor concern, the defendants publicly issued false and misleading financial statements that overstated Itron's revenue, net income and earnings per share.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

37. Itron admitted it issued false financial statements during the Class Period when it issued restated results on February 16, 2011. The restatement included the Company's financial statements for the first three quarters of fiscal year 2009.

**First Quarter of Fiscal year 2010**

**False and Misleading Statements Regarding Itron's Financial Results of 1Q10-3Q10**

38. **False Statement**: On April 28, 2010, Itron issued a press release entitled "Itron Announces First Quarter Financial Results." Therein, the Company stated, in relevant part:

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)     - 11 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

LIBERTY LAKE, Wash., Apr 28, 2010 (BUSINESS WIRE) – Itron, Inc. (NASDAQ:ITRI) today reported financial results for its first quarter ended March 31, 2010. Highlights of the quarter include:

- **_Quarterly revenues of $499 million_** with record North America revenues of $243 million;

- **_Quarterly non-GAAP diluted EPS of $1.01_** (inclusive of $0.26 of discrete tax benefits);

\* \* \*

Operations Highlights:

Revenues – **_Total revenues of $499 million for the first quarter of 2010_** were $111 million, or 29%, higher than 2009 first quarter revenues of $389 million.  North America revenues of $243 million for the first quarter of 2010 were $104 million, or 74%, higher than the comparable 2009 period revenues of $139 million.  The increase in revenue was primarily driven by higher shipments of OpenWay meters and modules.

\* \* \*

GAAP Net Income and Diluted EPS – **_Our GAAP net income and diluted EPS for the first quarter of 2010 was $26.8 million, or 66 cents per share_**, compared with a net loss of $19.7 million, or 55 cents per share, in the same period in 2009.

\* \* \*

Non-GAAP Net Income and Diluted EPS – **_Non-GAAP net income_**, which excludes amortization expenses related to intangibles assets, amortization of debt placement fees, the amortization of convertible debt discount, and the non-cash net loss associated with the convertible debt for stock exchange, **_was $41.3 million in the first quarter of 2010_**, compared with $12.2 million in the 2009 period.  **_Non-GAAP diluted EPS was $1.01 in the first quarter 2010_** compared with 33 cents in the 2009 period. Fully diluted shares outstanding in the first quarter of 2010 were 4.3 million shares higher than the same period in 2009 primarily due to the convertible debt for stock exchange in the first quarter of 2009 and the equity offering in the second quarter of 2009.

*Id.*

39.    **False Statement**: That same day, Itron hosted a 1Q10 earnings conference call with analysts and investors to discuss the Company's 1Q10 financial results.  Unsworth and Helmbrecht participated in the call and had an opportunity to

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS (2:11-cv-00077-RMP)    - 12 -    ROBBINS GELLER RUDMAN & DOWD LLP 655 West Broadway, Suite 1900, San Diego, California 92101 Telephone: 619/231-1058 • Fax: 619/231-7423

address analysts' and investors' questions and concerns, and correct any misinformation or misstatements. During the call, Helmbrecht stated:

> ***Revenue in the quarter was $499 million***,
>
>             *    *    *
>
> ***Non-GAAP diluted EPS was $1.01 for the quarter*** . . . .

Unsworth reiterated Helmbrecht's statements regarding revenue:

> ***Revenue for the quarter of $499 million*** . . . .

Company's 1Q10 Earnings Conference Call.

       40.     Analysts reacted positively to Itron's 1Q10 financial results raising their estimates. J.P. Morgan, for example, issued an analyst report covering Itron on April 29, 2010 entitled, "1Q10 Results: A Solid Start; Raising Ests and PT." The report stated, in part:

> We are raising our estimates – FY11 PF EPS goes to $4.04 (from $3.74) and FY11 revenue goes to $2.14 billion (from $2.06 billion). Our price target goes to $89 (from $82.50). ITRI remains our top pick for 2010. Reiterate Overweight.
>
>             *    *    *
>
> FY10 PF EPS goes to $3.53 (from $3.03) on $1,986mm in revenue (from $1,884mm). . . . FY11 PF EPS goes to $4.04 (from $3.74) on $2,135mm in revenue (from $2,058mm).

*Id.* That same day, Brean Murray Carret & Co. issued an analyst report covering Itron entitled "Dominant Smart-Meter Name Posts Strong 1Q EPS; Raising Estimates and Target Price to $84." In the report, Brean Murray stated, in part:

> With 1Q EPS ahead of our expectations . . . we are raising our FY10 EPS estimate a dime to $3.25 at this time and initiating our 2011 EPS estimate of $3.75. Given our new estimates, our 12-month target price is increased to $84.

*Id.*

       41.     On this news, Itron's stock closed up $5.18 per share to close at $81.15 per share on April 29, 2010 – its Class Period high.

42.  **False Statement**: On May 5, 2010, Itron filed its Quarterly Report with the SEC on Form 10-Q for the 2010 fiscal first quarter. The Company's Form 10-Q was signed by Helmbrecht and reaffirmed the Company's financial results previously announced on April 28, 2010.

43.  Defendants' statements in ¶¶38-39 and 42 above regarding Itron's 1Q10 financial results were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)  As detailed in ¶¶67-77 below, during 1Q10, Itron improperly recognized revenue on an OpenWay, or AMI, contract in connection with an extended warranty provision;

(b)  As a result, the Company overstated revenue, net income and EPS during the Class Period;

(c)  As detailed in ¶¶59-61 below, the Company lacked adequate internal controls;

(d)  As detailed in ¶¶67-77 below, as a consequence of the aforementioned practices, the Company's revenue, net income and EPS were artificially inflated and its reported financial results were in violation of GAAP;

(e)  But for defendants' improper accounting of the extended warranty provision, the Company would have reported lower revenue, net income and EPS during 1Q10; and

(f)  As a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

44.  Defendants' false and misleading statements regarding Itron's 1Q10 financial results had a direct effect on Itron's stock price which continued to trade at artificially inflated levels.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 14 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

**Second Quarter of Fiscal Year 2010**

45.    **False Statement**: On July 28, 2010, Itron issued a press release entitled, "Itron Announces Second Quarter Financial Results." Therein, the Company stated, in relevant part:

LIBERTY LAKE, Wash., Jul 28, 2010 (BUSINESS WIRE) – Itron, Inc. (NASDAQ:ITRI) today reported financial results for its second quarter and six months ended June 30, 2010. Highlights include:

- *Record quarterly and six month revenues of $569 million and $1.1 billion*;

- *Quarterly and six month non-GAAP diluted EPS of 98 cents and $1.99*;

\*      \*      \*

Malcolm Unsworth, president and CEO [said], "This performance underscores the strength of Itron's portfolio of products and solutions – the broadest in the industry. . . ."

Operations Highlights:

Revenues:

Total Company – *Total revenues of $569 million for the second quarter of 2010 and $1.1 billion for the first six months of 2010* were 38% and 33% higher than respective 2009 revenues of $414 and $802 million.

\*      \*      \*

GAAP Net Income and Diluted EPS – *Our GAAP net income and diluted EPS for the second quarter and first six months of 2010 was $26.9 million, or 65 cents per share*, and $53.7 million, or $1.31 per share. This compares with net income of $15.3 million, or 40 cents per share, and a net loss of $4.4 million, or 12 cents in the same periods in 2009. The increase in 2010 net income was primarily due to higher operating income in our North America segment.

\*      \*      \*

Non-GAAP Net Income and Diluted EPS – *Non-GAAP net income*, which excludes amortization expenses related to intangible assets, amortization of debt placement fees, the amortization of convertible debt discount, and the non-cash net loss associated with the convertible debt for stock exchange, *was $40.4 million in the second quarter and $81.7 million for the first six months of 2010*. This compares with $18.6 million and $30.8 million in the 2009 periods.

> ***Non-GAAP diluted EPS was 98 cents and $1.99 in the second quarter and first six months of 2010*** compared with 49 cents and 82 cents in the same periods of 2009. Fully diluted shares outstanding were 3.0 million and 3.7 million shares higher than the same periods in 2009 primarily due to the convertible debt for stock exchange in the first quarter of 2009 and the equity offering in the second quarter of 2009.

*Id.*

46.     **False Statement**: That same day, Itron hosted a 2Q10 earnings conference call with analysts and investors to discuss the Company's 2Q10 financial results.  Unsworth and Helmbrecht participated in the call and had an opportunity to address analysts' and investors' questions and concerns, and correct any misinformation or misstatements.  During the call, Helmbrecht highlighted:

> ***Record quarterly and six-month revenue of $569 million and $1.1 billion***.  Quarterly and six-month non-GAAP diluted earnings per share of $0.98 and $1.99.

Company's 2Q10 Earnings Conference Call.

47.     Analysts reacted positively to Itron's 2Q10 financial results.  Pritchard Capital Partners, LLC, for example, issued an analyst report covering Itron on July 29, 2010 entitled, "*Upgrading to 'Buy.'*"  The report stated, in part:

> We have raised our rating of ITRI to 'Buy' from 'Neutral' due to the solid Q2 financial performance . . ITRI reported adjusted non-GAAP EPS of $0.98 for the 2010 second quarter . . . .

*Id.*  That same day, Wunderlich Securities issued an analyst report covering Itron entitled "38% YOY Growth in 2Q10, but Revenue and Earnings Growth Slowing."  In the report, Wunderlich stated, in part:

> The company knocked the cover off the ball with revenue and non-GAAP EPS of $569 million and $0.98, respectively,
>
> *         *         *
>
> We are raising our 2010 revenue and non-GAAP EPS estimates to $2.1 billion and $3.38, respectively, from $2.0 billion and $2.67, respectively. The top-line boost is entirely from the 2Q10 results.

*Id.*

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 16 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1    48.    In direct response to this news, Itron's stock closed up more than $7.00

2  per share at $65.07 over the two-day period ending July 30, 2010.

3    49.    **False Statement**: On August 4, 2010, Itron filed its Quarterly Report with

4  the SEC on Form 10-Q for the 2010 fiscal second quarter.  The Company's Form 10-

5  Q was signed by Helmbrecht and reaffirmed the Company's financial results

6  previously announced on July 28, 2010.

7    50.    Defendants' statements in ¶¶45-46 and 49 above regarding Itron's 2Q10

8  financial results were materially false and misleading when made.  Defendants knew

9  or recklessly disregarded, but failed to disclose, the following:

10    (a)    As detailed in ¶¶67-77 below, during 2Q10, Itron improperly

11  recognized revenue on an OpenWay, or AMI, contract in connection with an extended

12  warranty provision;

13    (b)    As a result, the Company overstated revenue, net income and EPS

14  during the Class Period;

15    (c)    As detailed in ¶¶59-61 below, the Company lacked adequate

16  internal controls;

17    (d)    As detailed in ¶¶67-77 below, as a consequence of the

18  aforementioned practices, the Company's revenue, net income and EPS were

19  artificially inflated and its reported financial results were in violation of GAAP;

20    (e)    But for defendants' improper accounting of the extended warranty

21  provision, the Company would have reported lower revenue, net income and EPS

22  during 2Q10;

23    (f)    As a result of the above, the Company's financial statements were

24  materially false and misleading at all relevant times; and

25    (g)    The Company's performance, in part, was the result of its improper

26  accounting.

1    51.    Defendants' false and misleading statements regarding Itron's 2Q10

2  financial results had a direct effect on Itron's stock price which continued to trade at

3  artificially inflated levels.

4  **Third Quarter of Fiscal Year 2010**

5    52.    **False Statement**: On October 27, 2010, Itron issued a press release

6  entitled, "Itron Announces Record Quarterly Financial Results."    Therein, the

7  Company stated, in relevant part:

8      LIBERTY LAKE, Wash., Oct 27, 2010 (BUSINESS WIRE) –
       Itron, Inc. (NASDAQ:ITRI) today reported financial results for its third
9      quarter and nine months ended September 30, 2010. Highlights include:

10     • *Record quarterly and nine month revenues of $576 million and $1.6
       billion*;

11     • *Record quarterly and nine month non-GAAP diluted EPS of $1.06
12     and $3.06*;

13                          *    *    *

14     "Our growth this quarter has been driven by our smart solutions
       for electric, gas and water utilities.  Itron's investments and innovation
15     are paying off with outstanding results," said Malcolm Unsworth,
       president and CEO. . . .

16     Operations Highlights:

17     Revenues:

18
       Total Company – *Total revenues of $576 million for the third
19     quarter of 2010 and $1.6 billion for the first nine months of 2010* were
       41% and 36% higher than respective 2009 revenues of $408 million and
20     $1.2 billion.

21                          *    *    *

22     GAAP Net Income and Diluted EPS – *Our GAAP net income and
       diluted EPS for the third quarter and first nine months of 2010 were
23     $29.1 million, or 71 cents per share, and $82.8 million, or $2.02 per
       share*.  This compares with net losses of $3.0 million, or 7 cents per
24     share, and $7.4 million, or 19 cents per share in the same periods in
       2009.  The increase in 2010 net income was primarily due to higher
25     operating income in our North America segment.

26                          *    *    *

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 18 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

Non-GAAP Net Income and Diluted EPS – ***Non-GAAP net income***, which excludes amortization expenses related to intangible assets, amortization of debt placement fees, the amortization of convertible debt discount, and the non-cash net loss associated with the convertible debt for stock exchange, ***was $43.5 million in the third quarter and $125.2 million for the first nine months of 2010***. This compares with $18.2 million and $49.0 million in the 2009 periods. ***Non-GAAP diluted EPS was $1.06 and $3.06 in the third quarter and first nine months of 2010*** compared with 45 cents and $1.28 in the same periods of 2009. Fully diluted shares outstanding for the first nine months of 2010 were 2.6 million shares higher than the same period in 2009 primarily due to the convertible debt for stock exchange in the first quarter of 2009 and the equity offering in the second quarter of 2009.

*Id.*

53. **False Statement**: That same day, Itron hosted a 3Q10 earnings conference call with analysts and investors to discuss the Company's 3Q10 financial results. Unsworth and Helmbrecht participated in the call and had an opportunity to address analysts' and investors' questions and concerns, and correct any misinformation or misstatements. During the call, Helmbrecht stated:

Itron had a very strong quarter building on our balanced portfolio of electric, water, and gas solutions with record results. Here they are. ***Quarterly revenue growth of 41% to a record $576 million***. . . . ***Record quarterly and nine-month, non-GAAP diluted earnings per share of $1.06 and $3.06***.

Unsworth explained:

Itron's quarter of record growth and financial performance is a direct result of successful innovation in our balanced portfolio of electric, gas, and water solutions.[9]

54. Analysts reacted positively to Itron's 3Q10 financial results. Canaccord Genuity, for example, issued an analyst report covering Itron on October 28, 2010 entitled, "The Magic of the Smart Meter Model; Maintain Buy, $80 Target." The report stated, in part:

---

[9] Itron's 3Q10 Earnings Call Transcript, dated October 27, 2010 ("Company's 3Q10 Earnings Conference Call").

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 19 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

Our bullish thesis stays firm here, as Open Way (OW) visibility again drives operating leverage above expectations. The broad platform supports the mid-term outlook and EPS power, as we believe the cycle remains early worldwide and Itron well-positioned.

\*    \*    \*

Our 2010 estimates go to $2.22B/$2.81 from $2.18B/$3.55, while 2011E gets revised to $2.23B/$4.20 from $2.21B/$4.15.

*Id.* The same day, Cantor Fitzgerald issued an analyst report covering Itron entitled "3Q:10 AMI Continues to Shine; Estimates Going Up: BUY." In the report, Cantor Fitzgerald stated, in part:

We are raising our estimates for 2010 and 2011 significantly to adjust for a stronger revenue profile and operating leverage.

\*    \*    \*

We are increasing our 2010 estimate [of] non-GAAP earnings [to] $4.08 per share on revenues of $2.211 billion from our prior $3.57 per share on revenues of $2.13 billion. For 2011, we are increasing our estimate [of] non-GAAP earnings [to] $4.51 per share on revenues of $2.461 billion from our prior $4.01 per share on revenues of $2.4 billion.

*Id.*

55. **False Statement**: On November 2, 2010, Itron filed its Quarterly Report with the SEC on Form 10-Q for the 2010 fiscal third quarter. The Company's Form 10-Q was signed by Helmbrecht and reaffirmed the Company's financial results previously announced on October 27, 2010.

56. Defendants' statements in ¶¶52-53 and 55 above regarding Itron's 3Q10 financial results were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶67-77 below, during 3Q10, Itron improperly recognized revenue on an OpenWay, or AMI, contract in connection with an extended warranty provision;

(b) As a result, the Company overstated revenue, net income and EPS during the Class Period;

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)            - 20 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1      (c)    As detailed in ¶¶59-61 below, the Company lacked adequate

2  internal controls;

3      (d)    As detailed in ¶¶67-77 below, as a consequence of the

4  aforementioned practices, the Company's revenue, net income and EPS were

5  artificially inflated and its reported financial results were in violation of GAAP;

6      (e)    But for defendants' improper accounting of the extended warranty

7  provision, the Company would have reported lower revenue, net income and EPS

8  during 3Q10;

9      (f)    As a result of the above, the Company's financial statements were

10  materially false and misleading at all relevant times; and

11      (g)    The Company's growth was the result of its improper accounting.

12      57.    Defendants' false and misleading statements regarding Itron's 3Q10

13  financial results had a direct effect on Itron's stock price which continued to trade at

14  artificially inflated levels.

15      58.    Defendants' statements identified in ¶¶38-39, 42, 45-46, 49, 52-53 and 55

16  above, which were false and misleading when made, had a direct effect on Itron's

17  stock price, which continued to trade at artificially inflated levels.

18  **Defendants' Sarbanes Oxley Certifications Were False and Misleading**

19      59.    **False Statement**: Itron senior management, and specifically Unsworth

20  and Helmbrecht, were responsible for evaluating the Company's internal controls over

21  financial reporting and reporting the results of their evaluation to investors in Itron's

22  SEC filings.  The following disclosure appeared in the Company's Forms 10-Q during

23  the Class Period:

24      An evaluation was performed under the supervision of and with the
       participation of our Company's management, including the Chief
25      Executive Officer and Chief Financial Officer, of the effectiveness of the
       design and operation of the Company's disclosure controls and
26      procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e))
       under the Securities Exchange Act of 1934, as amended.  Based on that

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)        - 21 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1    evaluation, the Company's management, including the Chief Executive
2    Officer and Chief Financial Officer, concluded that as of March 31, 2010
     [and June 30, 2010 and September 30, 2010], the Company's disclosure
     controls and procedures were effective to ensure the information
3    required to be disclosed by an issuer in the reports that it files or submits
     under the Securities Exchange Act of 1934 is accumulated and
4    communicated to our management, including our principal executive and
     principal financial officers, or persons performing similar functions, as
5    appropriate, to allow timely decisions regarding required disclosure.

6    *See* Company's Forms 10-Qs for Periods ending March 31, 2010; June 30, 2010; and

7    September 30, 2010.

8        60.    **False Statement**: As part of their responsibility, the defendants signed

9    the following SOX certifications in each Form 10-Q during the Class Period in which

10   they (1) certified that they had performed evaluations of Itron's financial statements,

11   disclosure controls and internal controls over financial reporting and (2) as a result of

12   their evaluations, they were certifying the accuracy of Itron's financial statements and

13   the effectiveness of Itron's disclosure controls and internal controls over financial

14   reporting:

15   I, [President and Chief Executive Officer or Chief Financial Officer],
     certify that:
16
17   1.    I have reviewed this Quarterly Report on Form 10-Q of Itron, Inc.;

18   2.    Based on my knowledge, this report does not contain any untrue
     statement of a material fact or omit to state a material fact necessary to
     make the statements made, in light of the circumstances under which
19   such statements were made, not misleading with respect to the period
     covered by this report;
20
21   3.    Based on my knowledge, the financial statements, and other
     financial information included in this report, fairly present in all material
     respects the financial condition, results of operations and cash flows of
22   the registrant as of, and for, the periods presented in this report;

23   4.    The registrant's other certifying officer and I are responsible for
     establishing and maintaining disclosure controls and procedures (as
24   defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal
     control over financial reporting (as defined in Exchange Act Rules 13a-
25   15(f) and 15d-15(f)) for the registrant and have:

26       a)    Designed such disclosure controls and procedures, or
     caused such disclosure controls and procedures to be designed under our

1    supervision, to ensure that material information relating to the registrant,
2    including its consolidated subsidiaries, is made known to us by others
     within those entities, particularly during the period in which this report is
     being prepared;

3
4              b)    Designed such internal control over financial reporting, or
     caused such internal control over financial reporting to be designed
5    under our supervision, to provide reasonable assurance regarding the
     reliability of financial reporting and the preparation of financial
6    statements for external purposes in accordance with generally accepted
     accounting principles;

7              c)    Evaluated the effectiveness of the registrant's disclosure
8    controls and procedures and presented in this report our conclusions
     about the effectiveness of the disclosure controls and procedures, as of
9    the end of the period covered by this report based on such evaluation;
     and

10             d)    Disclosed in this report any change in the registrant's
11   internal control over financial reporting that occurred during the
     registrant's most recent fiscal quarter (the registrant's fourth fiscal
12   quarter in the case of an annual report) that has materially affected, or is
     reasonably likely to materially affect, the registrant's internal control
13   over financial reporting; and

14   5.    The registrant's other certifying officer and I have disclosed,
     based on our most recent evaluation of internal control over financial
15   reporting, to the registrant's auditors and the audit committee of the
     registrant's board of directors (or persons performing the equivalent
16   functions):

17             a)    All significant deficiencies and material weaknesses in the
     design or operation of internal control over financial reporting which are
18   reasonably likely to adversely affect the registrant's ability to record,
     process, summarize and report financial information; and

19             b)    Any fraud, whether or not material, that involves
20   management or other employees who have a significant role in the
     registrant's internal control over financial reporting.

21   ITRON, INC.

22   By: /s/[_____]

23   Date: [_____]

24   *Id.*

25   61.    The Company has since admitted, through its restatement, that these

26   certifications were false because its Class Period financial statements, in fact, did not

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 23 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

"fairly present in all material respects the financial condition, results of operations, and cash flows of [Itron]." *Id.*

62.    Defendants' statements identified in ¶¶59-60 above, which were false and misleading when made, had a direct effect on Itron's stock price, which continued to trade at artificially inflated levels.

**THE TRUTH EMERGES AS ITRON RESTATES
ITS FINANCIAL RESULTS**

63.    On February 16, 2011, Itron issued a press release announcing fourth quarter and fiscal 2010 results, which included a restatement of its financial results for the first three quarters of 2010. The Company reported making these revisions due to improperly recognizing revenue on a large AMI contract for an extended warranty obligation. The Company's restatement of its financial results reduced total revenue for the first nine months of 2010 by $6.1 million and diluted EPS were reduced by $0.11 over this same time period.

64.    On this news, Itron's stock collapsed $6.33 per share to close at $57.29 per share on February 17, 2011, a one-day decline of nearly 10% on high volume.

65.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to properly account for its extended warranty obligations in violation of GAAP; and

(b)    The Company had failed to maintain effective internal controls.

66.    As a result of defendants' false statements, Itron's stock traded at artificially inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 29% from their Class Period high.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 24 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING DURING THE CLASS PERIOD

67.     Throughout the Class Period, defendants reported false and misleading revenues and earnings in Itron's press releases and Forms 10-Q filed with the SEC. Defendants falsely stated that the Company's financial statements were in conformity with GAAP.[10]

68.     Contrary to defendants' statements, Itron's financial statements were not prepared in accordance with GAAP or SEC requirements, thus they were not a fair representation of the Company's operations.  Throughout the Class Period, defendants improperly prematurely recognized revenue related to an extended warranty which caused the Company's revenue, net income and per share earnings to be overstated. As a result, the Company falsely reported its financial results in its filings with the SEC on Forms 10-Q on May 5, 2010 (1Q10), August 4, 2010 (2Q10), and November 2, 2010 (3Q10), and were required to restate its financials as illustrated below:

| (In $000's, except per share data) | Originally Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| **Quarter Ended 3/31/10 (1Q10):** | | | | |
| Revenue | 499,280 | 497,623 | 1,657 | 0.3% |
| Net Income | 26,787 | 25,250 | 1,537 | 5.7% |
| Earnings Per Share – Basic | $0.67 | $0.63 | $0.04 | 6.0% |
| Earnings Per Share – Diluted | $0.66 | $0.62 | $0.04 | 6.1% |

---

[10]     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)         - 25 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

| (In $000's, except per share data) | | | | |
|---|---|---|---|---|
| | Originally Reported | Restated | Amount Overstated | % Overstated |
| **Quarter Ended 6/30/10 (2Q10):** | | | | |
| Revenue | 569,460 | 567,339 | 2,121 | 0.4% |
| Net Income | 26,900 | 25,311 | 1,589 | 5.9% |
| Earnings Per Share – Basic | $0.67 | $0.63 | $0.04 | 6.0% |
| Earnings Per Share – Diluted | $0.65 | $0.61 | $0.04 | 6.2% |
| **Quarter Ended 9/30/10 (3Q10):** | | | | |
| Revenue | 575,968 | 573,651 | 2,317 | 0.4% |
| Net Income | 29,108 | 27,639 | 1,469 | 5.0% |
| Earnings Per Share – Basic | $0.72 | $0.68 | $0.04 | 5.6% |
| Earnings Per Share – Diluted | $0.71 | $0.68 | $0.03 | 4.2% |

**Itron Has Acknowledged the Material Error and Restated Its Financial Statements**

69.    There is no dispute about the falsity of Itron's financial statements.  The fact that Itron restated is an admission that (1) the publicly-issued financial statements for each of the restated periods were *not prepared in conformity with GAAP*; (2) they *materially misrepresented* the Company's financial condition and results of operations; and (3) the financial statements reported during the Class Period were *incorrect based on information available to Defendants at the time the results were originally reported*.

70.    The restatement of previously issued public financial statements is a serious and meaningful event.  Accounting rules governing the correction of errors or fraud in previously issued financial statements do not allow a registrant any discretion or election in deciding whether or not to retroactively restate its previously issued financial statements.  Under GAAP, a restatement of previously issued financial statements is reserved only for circumstances where no lesser remedy is available.  As

1  noted by the SEC, "GAAP only allows a restatement of prior financial statements

2  based upon information 'that existed at the time the financial statements were

3  prepared,'" and "restatements should not be used to make any adjustments to take into

4  account subsequent information that did not and could not have existed at the time the

5  original financial statements were prepared."[11]  GAAP requires that restatements are

6  used to correct errors.  "Any error in the financial statements of a prior period

7  discovered after the financial statements are issued or are available to be issued . . .

8  shall be reported as an error correction, by restating the prior-period financial

9  statements."[12] *FASB Accounting Standards Codification*™ ("ASC") 250-10-45-23.  A

10  mere change in accounting estimate is not eligible for restatement treatment.  ASC

11  250-10-45-17.  Indeed, as alleged herein, the restatement at issue here was due to a

12  material accounting error that plaintiffs allege was due to intentional misuse of the

13  facts that were known at the time.

**Itron Improperly Recognized Revenue for an**
14  **Extended Warranty in Violation of GAAP**

15      71.    Certain of Itron's revenue arrangements include an extended or

16  noncustomary warranty provision which covers all or a portion of a customer's

17

18  _____

19  [11]      Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants'

20  Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report, *In re Sunbeam Sec. Litig.*, No. 98-

21  cv-8258-DMM-Civ.-Middlebrooks, at 11, 13 (S.D. Fla. Feb. 22, 2002) ("*Sunbeam* Brief"), *available at* http://www.sec.

22  gov/litigation/briefs/sunbeam.htm.

23  [12]      The type of error that may be corrected through a restatement is "an error in recognition, measurement,

24  presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of

25  GAAP, or ***oversight or misuse of facts that existed at the time that the financial statements were prepared***."  FASB

26  Statement of Financial Accounting Standards No. 154 ¶2h.

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 27 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1  replacement or repair costs beyond the standard or customary warranty period.

2  Whether or not the extended warranty is separately priced in the arrangement, a

3  portion of the arrangement's total consideration must be allocated to the extended

4  warranty deliverable.   This revenue must be deferred and recognized over the

5  extended warranty coverage period.  Itron failed to follow this policy during the Class

6  Period in violation of GAAP and its own stated policy.

7        72.    Instead of properly deferring the revenue for the extended warranty and

8  recognizing it over the warranty coverage period, defendants prematurely recognized

9  this revenue prior to the coverage period.  The result was inflated revenue, net income

10  and earnings per share by as much as 6% in each quarter during the Class Period.  *See*

11  table at ¶68 above.

12  **GAAP Required Itron to Defer Unearned Warranty Revenue**

13        73.    GAAP requires that revenue ***not*** be recognized until being realized or

14  realizable and until earned.   ASC 605-10-25-1 and ASC 605-20.   SEC Staff

15  Accounting Bulletin ("SAB") 104, requires that all of the following four criteria must

16  be met before revenue may be recognized: persuasive evidence of an arrangement

17  exists; delivery has occurred; the seller's price to the buyer is fixed or determinable;

18  and collectability is reasonably assured.  *See also* ASC 605-20.

19        74.    Specifically regarding extended warranties, GAAP states that the

20  premiums for extended warranties should be deferred and ***recognized as revenue over***

21  ***the period of the extended warranty*** contract in proportion to the amount of

22  protection provided, which generally results in premiums being recognized as revenue

23  evenly over the extended warranty contract period.  ASC 605-20-25-2.  GAAP goes

24  on to state:

25          Sellers of extended warranty or product maintenance contracts
        have an obligation to the buyer to perform services throughout the period

26          of the contract and, therefore, revenue shall be ***recognized in income***
        ***over the period in which the seller is obligated to perform***.  That is,

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

revenue from separately priced extended warranty and product maintenance contracts shall be ***deferred*** and recognized in income on a straight-line basis over the contract period . . . .

ASC 605-20-25-3.

75.    The extended warranty coverage period for Itron's contract had not yet begun during the Class Period.  Thus, the related fees had not been realized nor earned during the Class Period, and revenue recognition was thereby prohibited.  Itron was required to defer revenue (*i.e.*, record a liability called "unearned revenue") relating to the extended warranty, but it did not.

76.    Similarly, Itron's own accounting policy, which was publicly disclosed in its 2009 Form 10-K filed a mere two months prior to the start of the Class Period, stated that unearned revenue is recorded when a customer pays for products or services where the criteria for revenue recognition have not been met as of the balance sheet date and that unearned revenue relating to extended warranties is recognized when the applicable revenue recognition criteria are met (*i.e.*, over the extended warranty coverage period).

77.    Itron failed to properly defer the unearned revenue relating to the extended warranty provision and instead improperly prematurely recognized the revenue in violation of GAAP and the Company's own publicly-stated policy.

**Other GAAP Violations**

78.    In addition to the GAAP and SEC violations described above, the Company also violated the following fundamental GAAP principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (ASC 270-10-45-2);

(b)    The principle that interim financial information provide investors and others with timely information as to the progress of the entity (ASC 270-10-45-1);

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)    - 29 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1    (c)     The principle that financial statements shall contain all data

2  necessary for a fair presentation of financial position and results of operations as set

3  forth in GAAP, including compliance with the requirements of the SEC's rules and

4  regulations by SEC registrants (ASC 205-10);

5    (d)     The principle that financial reporting should provide information

6  that is useful to present and potential investors and creditors and other users in making

7  rational investment, credit and similar decisions (Statement of Financial Accounting

8  Concepts ("SFAC") No. 1, ¶34);

9    (e)     The principle that financial reporting should provide information

10  about the economic resources of an enterprise, the claims to those resources, and

11  effects of transactions, events and circumstances that change resources and claims to

12  those resources (SFAC No. 1, ¶40);

13    (f)     The principle that financial reporting should provide information

14  about an enterprise's financial performance during a period.  Investors and creditors

15  often use information about the past to help in assessing the prospects of an enterprise.

16  Thus, although investment and credit decisions reflect investors' expectations about

17  future enterprise performance, those expectations are commonly based at least partly

18  on evaluations of past enterprise performance (SFAC No. 1, ¶42);

19    (g)     The principle that financial reporting should be reliable in that it

20  represents what it purports to represent.  That information should be reliable as well as

21  relevant is a notion that is central to accounting (SFAC No. 2, ¶¶58-59);

22    (h)     The principle of completeness, which means that nothing is left out

23  of the information that may be necessary to insure that it validly represents underlying

24  events and conditions (SFAC No. 2, ¶79); and

25    (i)     The principle that conservatism be used as a prudent reaction to

26  uncertainty to try to ensure that uncertainties and risks inherent in business situations

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 30 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1   are adequately considered.  The best way to avoid injury to investors is to try to ensure

2   that what is reported represents what it purports to represent (SFAC No. 2, ¶¶95, 97).

3       79.    Additionally, SAB Topic 1M, *Materiality*, summarizes GAAP definitions

4   of materiality.  SAB Topic 1M represents the codification of certain SAB's, including

5   SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 became effective August

6   12, 1999.  SAB Topic 1M says, *inter alia*, "[a] matter is 'material' if there is a

7   substantial likelihood that a reasonable person would consider it important."  It also

8   stresses that materiality requires qualitative, as well as quantitative, considerations.

9   For example, considerations, such as whether the misstatement arises from an item

10  capable of precise measurement, are factors that should be taken into account in

11  determining the materiality of the misstatement.  Defendants' improper accounting for

12  extended warranty revenue was material.

13                              **SCIENTER**

14      80.    As alleged in the following paragraphs, defendants had actual knowledge

15  of the falsity of their Class Period financial statements or acted in reckless disregard of

16  the truth or falsity of those statements.  In doing so, defendants committed acts and

17  participated in a course of business that operated as a fraud or deceit on purchasers or

18  acquirers of Itron's stock during the Class Period.

19  **Defendants Were Motivated to Improperly Inflate Earnings**

20      81.    As described in ¶¶31-35 above, prior to and during the Class Period, Itron

21  was aggressively competing for AMI contracts with various utilities, many of which

22  had just received substantial stimulus awards from the Federal government that were

23  targeted at developing the smart grid to more efficiently manage power use.  At the

24  beginning of the Class Period, Itron had not won a major AMI contract in more than a

25  year, and the Company failed to win any major AMI contracts throughout the Class

26  Period.  As a result, analysts and investors were concerned that a potential decrease in

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 31 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

backlog would result in decreased revenue and earnings going forward, and defendants were motivated to inflate revenue and earnings during the Class Period in order allay investor concern over Itron's future financial results.

**The Magnitude of the Extended Warranty Provision and the Importance of the AMI Contracts to Itron's Financial Results Suggests Scienter**

82.    During the Company's 4Q10 Earnings Conference Call,[13] defendants explained that the restatement related to an extended warranty provision for a single OpenWay contract.  OpenWay is Itron's AMI solution.  The single warranty provision alone represents more than $6 million in revenue, $4.6 million in net income and $0.11 in earnings per share – approximately 6% of the Company's net income and earnings per share for the nine months ended September 30, 2010.  As defendants explained, a warranty provision that comprises such a significant portion of the Company's net income can only relate to a large contract.

83.    At the time of the restatement, the Company only maintained four major OpenWay, or AMI, contracts – with Southern California Edison, Center Point Energy, DTE Energy and San Diego Gas & Electric.  As detailed in ¶¶6-8 and 31-35 above, these contracts were key to the Company's financial performance and both the Company and analysts repeatedly stressed their importance to the Company's financial results.

84.    The Company's Code of Conduct and Ethics, which the Individual Defendants were required to honor, stated:

> All transactions with the Company must be recorded to permit the preparation of financial statements in conformity with generally accepted accounting principles (GAAP).  This financial information serves as the basis for managing Itron's business, measuring and fulfilling Itron

---

[13]    Itron's 4Q 2010 Earnings Conference Call Transcript, dated February 16, 011 ("Company's 4Q10 Earnings Conference Call").

1   obligations, and complying with tax and financial reporting
2   requirements. Financial records must represent the actual facts and the
    actual nature of the transaction. Accounting and financial reporting
3   practices must be fair and proper, in accordance with GAAP and using
    management's best judgment.

4   *Available at* http://www.investors.itron.com/corporategovernance.cfm.

5       85.   In order to ensure the integrity of Itron's financial results, the Code of

6   Conduct and Ethics further mandated that defendants and other Itron employees were

7   required to maintain "***[c]lear, open and frequent communication among all***

8   ***management levels and personnel on all significant financial and operating***

9   ***matters***." *Id.*

10      86.   The "[c]lear, open and frequent communication" required of management

11  concerning significant contracts would have revealed to defendants the improper

12  accounting associated with the extended warranty provision. *See id.*

13      87.   Defendants were further incentivized to pay close attention to the

14  accounting for major contracts because §304 of SOX requires that the CEO Unsworth

15  and CFO Helmbrecht reimburse Itron for any annual cash bonuses and other

16  incentive-based compensation received during the first twelve months following the

17  first public issuance or filing of any financial statements that were restated as a result

18  of certain material noncompliance with financial reporting requirements. Because, as

19  detailed in ¶97 below, 75% of the Individual Defendants' annual compensation was

20  incentive-based, they would have paid close attention to significant accounting

21  matters, including accounting for the Company's largest transactions.

22  **Management Was Specifically Responsible For Preparing
    Itron's Financial Statements**
23

24      88.   The Individual Defendants alone had ultimate responsibility for the

25  preparation of Itron's financial statements.

26      89.   In the Company's FY10 Form 10-K, for example, the Individual

Defendants provided a "Report of Management" to the Company's Board of Directors

and Shareholders of Itron, stating that "Management is responsible for the preparation of our consolidated financial statements and related information." *Id.* at 32.

90.    Management is also responsible for preparing financial statements that conform with GAAP.  The AICPA Professional Standards provide:

> The financial statements are management's responsibility. . . .
> Management is responsible for adopting sound accounting policies and
> for establishing and maintaining internal control that will, among other
> things, initiate, record, process, and report transactions (as well as events
> and conditions) consistent with management's assertions embodied in
> the financial statements.  The entity's transactions and the related assets,
> liabilities, and equity are within the direct knowledge and control of
> management. . . .  Thus, the fair presentation of financial statements in
> conformity with generally accepted accounting principles is an implicit
> and integral part of management's responsibility.

AU § 110.03.

91.    Defendants' ultimate responsibility for preparing Itron's financial statements would have revealed the improper accounting that ultimately led to the Company's restatement of its Class Period financial statements.

**Itron's Restatement Supports Scienter**

92.    As described above, Itron's restatement is an admission that the financial statements originally issued during the Class Period and its public statements regarding those results were materially false and misleading.  Additionally, Itron's restatement, as described herein, contains the following indicia of knowledge by defendants:

(a)    ***The type of restatement (misuse of the facts)*** – Itron's restatement was not the result of certain conditions contemplated under ASC 250-10-45 and FASB Statement of Financial Accounting Standards No. 154 including simple mathematical errors, the honest misapplication of GAAP, or a change in accounting principle. Rather, Itron's financial statements were false and misleading and were required to be restated as a result of defendants' misuse of information available to them at the time the financial statements were originally prepared;

645069_2
CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)        - 34 -
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1    (b)    ***The duration over which the improper accounting was***
2    ***perpetrated*** – as detailed herein, the restatement does not hinge on an honest mistake
3    or oversight during a single quarter that was later corrected on a good faith basis.
4    Itron was forced to restate its financial statements covering three quarters to correct its
5    accounting improprieties that could no longer be concealed;

6    (c)    ***The magnitude or size of the restatement*** – as detailed herein,
7    including ¶10 above, Itron's restatement was material.  Itron overstated its Class
8    Period net income and earnings per share by 5%-6%.  Indeed, Staff Accounting
9    Bulletin No. 99 (SAB Topic 1M) specifically states that a 5% misstatement is often a
10   "rule of thumb" when assessing materiality but stresses that even misstatements under
11   5% can be material;

12   (d)    ***The types of accounting gimmicks employed*** – as detailed herein,
13   including ¶9 above, the improper accounting corrected by this restatement did not
14   occur as a result of good faith differences in subjective accounting areas, or
15   interpretations of complicated, vague, or arcane accounting rules.    Itron's
16   misstatements were the result of failing to comply with simplistic, clear, concise, and
17   fundamental accounting rules; and

18   (e)    ***The income statement effect of the misstatements*** – moreover, it
19   is more than sheer coincidence that the "revisions" identified by the Company as part
20   of the restatement had the effect of inflating, not reducing, revenue, net income and
21   EPS.

22   93.    Finally, it is notable that in 2002 the SEC reiterated its position that, in its
23   investigations of restated financial statements, it often finds that the persons
24   responsible for the improper accounting acted with scienter:

25   [T]he Commission often seeks to enter into evidence restated financial
     statements, and the documentation behind those restatements, in its
26   securities fraud enforcement actions in order, ***inter alia, to prove the***
     ***falsity and materiality of the original financial statements [and] to***

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)                - 35 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

***demonstrate that persons responsible for the original misstatements acted with scienter*** . . . .

*Sunbeam* Brief at 2.

**Defendants' False SOX Certifications Establish Scienter**

94.     Defendants' "review" of Itron's financial statements, "evaluation" of Itron's disclosure controls, and "evaluation" of Itron's internal control over financial reporting, that defendants certified they had personally performed as of the dates they signed the above SOX certifications, would clearly have alerted defendants to the presence of the accounting misstatements and lapse in internal controls described herein.   Therefore, defendants either knew of the material misstatements in the financial statements, the ineffectiveness of the disclosure controls and the lapse in internal controls, or the defendants knowingly failed to carry out the required review of the financial statements, evaluation of disclosure controls, and evaluation of internal controls as they stated they had done in the certification.  In either case, the defendants knew or recklessly disregarded that the SOX certifications they signed were false.

95.     As stated in ¶90 above, management is responsible for preparing financial statements that conform with GAAP.

**Executive Compensation**

96.     The Individual Defendants' personal wealth was also directly tied to Itron's financial performance, as a significant portion of their executive compensation packages were dependent upon Itron's posting favorable financial results.  During the Class Period, the Compensation Committee of Itron's Board of Directors approved and administered the Company's executive compensation program, including the incentive-based components of the program.  The Compensation Committee reviewed and recommended the compensation of CEO Unsworth for approval by the Board. The Compensation Committee seeks the input of executives concerning executive

1    compensation, Company and individual performance, and competitive compensation

2    levels and practices, and specifically receives recommendations from the CEO

3    regarding the compensation of fellow Itron executives.  According to the Company's

4    proxy statements filed with the SEC during the Class Period, Itron's compensation

5    program was designed to closely align the financial interests of the Company's

6    executives with those of its stockholders.  But while the Individual Defendants were

7    paid out during the Class Period as Itron was issuing artificially inflated financial

8    figures, it was the investors who lost money when defendants' fraudulent scheme was

9    revealed.

10    98.    Itron's executive compensation program placed a substantial portion of

11    executive pay – approximately 75% – at risk.  Accordingly, the majority of the

12    Individual Defendants' compensation was dependant upon Company and individual

13    performance, and had three primary components.  Executives were paid a base salary,

14    performance bonuses, and long-term incentive compensation in the form of stock

15    options and equity, including time-vesting and performance based restricted stock

16    units.

17    98.    For FY10, Unsworth and Helmbrecht were eligible to receive a bonus, or

18    annual cash award, based 40% on the Company's non-GAAP net income, 30% on

19    revenue and 30% on cash flow from operations.  The target bonus level was an

20    additional 200% for each Individual Defendant.

21    99.    The Individual Defendants were paid millions of dollars in executive

22    compensation for FY10, based in part upon Itron's Class Period financial results the

23    Company ultimately admitted were false, as follows:

24

25

26

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 37 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

| Name and Principal Position | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Malcolm Unsworth – CEO | 748,461 | 2,033,421 | 747,467 | 1,500,000 | 74,854 | 5,104,203 |
| Steve Helmbrecht – CFO | 424,615 | 638,377 | 234,916 | 637,500 | 32,834 | 1,968,246 |

## LOSS CAUSATION

100.   During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Itron securities and operated as a fraud or deceit on Class Period purchasers of Itron securities by misrepresenting the Company's business and prospects.   Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Itron securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Itron securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

101.   Defendants' false statements and omissions, identified herein at ¶¶38-39, 42, 45-46, 49, 52-53, 55, 59 and 60 above, had the intended effect and caused Itron's stock to trade at artificially inflated levels.  As a direct result of the disclosures on February 16, 2011, Itron's stock price suffered a material, statistically significant decline. *See* ¶¶11, 63-64 above.  The stock decline removed the inflation from Itron's stock price, causing real economic loss to investors who had purchased the Company's common stock during the Class Period.

102.   On February 16, 2011, Itron disclosed that its previously issued financial statements for 1Q10, 2Q10 and 3Q10 contained accounting errors, leading to Itron's restatement of its Class Period financial figures.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 38 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

103.   On this news, Itron's stock collapsed $6.33 per share to close at $57.29 per share on February 17, 2011, a one-day decline of nearly 10% on unusually high volume.

104.   The major decline in Itron's stock price following the Company's disclosure of restated financial statements at the end of the Class Period was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market.

105.   The damages suffered by plaintiff and other members of the class were a direct result of defendants' fraudulent scheme to artificially inflate Itron's stock price and maintain the price at artificially inflated levels and the subsequent significant decline in the value of Itron's stock when defendants' prior misrepresentations and omissions were revealed.

**NO SAFE HARBOR**

106.   Itron's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

107.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  None of the specific statements pleaded herein were "forward-looking statements."  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 39 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

108.    To the extent there were any forward-looking statements, they were not identified as such nor was there meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements given to investors. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized or approved by an executive officer of Itron who knew that those statements were false when made.

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

109.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)          - 40 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1           (c)     engaged in acts, practices and a course of business that operated as

2 a fraud or deceit upon plaintiff and others similarly situated in connection with their

3 purchases of Itron securities during the Class Period.

4       112.   All defendants are sued either as primary participants in the wrongful and

5 illegal conduct charged herein or as controlling persons as alleged below.

6       113.   Defendants had actual knowledge of the misrepresentations and

7 omissions of material facts set forth herein, or acted with reckless disregard for the

8 truth in that they failed to ascertain and to disclose such facts, even though such facts

9 were available to them.  As such, defendants' material misrepresentations and/or

10 omissions were made knowingly or with a reckless disregard for the truth and for the

11 purpose and effect of supporting the artificially inflated prices of the Company's

12 publicly traded securities.

13       114.   As a result of the dissemination of the materially false and misleading

14 information and failure to disclose material facts, as set forth above, the market price

15 of Itron's publicly traded securities were artificially inflated during the Class Period.

16 In ignorance of the fact that the market price of Itron's publicly traded securities was

17 artificially inflated, and relying directly or indirectly on the false and misleading

18 statements made by defendants, or upon the integrity of the markets in which the

19 securities trade and/or on the absence of material adverse information that was known

20 to or recklessly disregarded by defendants, but not disclosed in public statements by

21 defendants during the Class Period, plaintiff and the other members of the Class

22 acquired Itron publicly traded securities during the Class Period at artificially inflated

23 prices and were damaged when the artificial inflation came out of the securities.

24       115.   At the time of defendants' false and misleading statements, plaintiff and

25 other members of the Class were ignorant of their falsity and believed them to be true.

26 Had plaintiff, the other members of the Class and the marketplace known the truth

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)    - 41 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

regarding Itron's financial statements, that was not disclosed by defendants, they would not have purchased or otherwise acquired their Itron publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices they paid.

116.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

117.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.    The Individual Defendants acted as controlling persons of Itron within the meaning of §20(a) of the Exchange Act.  By virtue of their high level positions with the Company, participation in and awareness of the Company's operations, intimate knowledge of and participation in the dissemination of the false and misleading statements to the public, and ownership of Itron stock, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements plaintiff contends are false.  The defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements, alleged by plaintiff to be misleading, prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)                - 42 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

119. In particular, each of the defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

120. Additionally, Itron controlled the Individual Defendants and all of its employees.

121. As set forth above, each of the defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, and certifying plaintiff as class representative under Rule 23 of the Federal Rule of Civil Procedure;

B. Awarding compensatory damages in favor of plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable, injunctive or other and further relief as the Court may deem just and proper.

## JURY DEMAND

122. Plaintiff demands a trial by jury.

645069_2

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)                - 43 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1

DATED:  August 22, 2011

ROBBINS GELLER RUDMAN &
  DOWD LLP
X. JAY ALVAREZ
JENNIFER L. GMITRO

2

3

4

_____
s/ X. JAY ALVAREZ
X. JAY ALVAREZ

5

6

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
jgmitro@rgrdlaw.com

7

8

9

Lead Counsel for Plaintiffs

10

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN, WSBA #12536
KARL P. BARTH, WSBA #22780
JENIPHR BRECKENRIDGE, WSBA #21410
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steveb@hbsslaw.com
karlb@hbsslaw.com
jeniphrb@hbsslaw.com

11

12

13

14

15

16

Liaison Counsel

17

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

18

19

20

21

Additional Counsel for Plaintiff

22

23

24

25

26

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)

- 44 -

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 22, 2011.

s/ X. JAY ALVAREZ
X. JAY ALVAREZ

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:      JayA@rgrdlaw.com

CONSOL CPT FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS (2:11-cv-00077-RMP)

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

# Mailing Information for a Case 2:11-cv-00077-RMP

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X Jay Alvarez**
  jaya@rgrdlaw.com

- **Karl P Barth**
  karlb@hbsslaw.com,dawn@hbsslaw.com,shelbys@hbsslaw.com

- **Ronald L Berenstain**
  rberenstain@perkinscoie.com,docketsea@perkinscoie.com,jstarr@perkinscoie.com

- **Steve W Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **Jennifer L Gmitro**
  jgmitro@rgrdlaw.com,hectorm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sean C Knowles**
  sknowles@perkinscoie.com,docketsea@perkinscoie.com,jnorville@perkinscoie.com,KRobinson@perkinscoie.com

- **Angela Rene Martinez**
  AMartinez@perkinscoie.com,docketsea@perkinscoie.com,jbrasser@perkinscoie.com

- **Austin Rice-Stitt**
  aricestitt@perkinscoie.com,kklemperer@perkinscoie.com,docketsea@perkinscoie.com

- **Tyler S Weaver**
  tyler@hbsslaw.com,carrie@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)